UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GIULIO MUSTO, AUREA AVILA, DONNA
BATES, ANA GARCIA, JOSEPH E. DUNCAN,
HERBERT CARRILLO, AGNES DALLAS, DAVE
DENNY, ALFONSO FERGUSON, ANGELA
TAYLOR HEADLEY, CAMERON KING, COLIN
MAYERS, FEDERICO PAUL, IRWIN ROBERTS,
JOSE RODRIGUEZ, RENFORD SCOTT and                    MEMORANDUM AND ORDER
CLAUDINE SMITH,

               Plaintiffs,                              Civil Action No.
                                                      03-CV-2325(RJD)(ALC)
     -against-

TRANSPORT WORKERS UNION OF AMERICA,
AFL-CIO, LOCAL 501 TRANSPORT WORKERS
UNION OF AMERICA, AFL-CIO and AMERICAN
AIRLINES, INC.,

               Defendants.
------------------------------------------------------------------X
DEARIE, United States District Judge:

       Plaintiffs, a group of former employees of American Airlines who were laid off in 2002,

bring this hybrid suit against defendants Transport Workers Union of America AFL-CIO

("TWU"), Local 501 Transport Workers Union of America ("Local 501") and American

Airlines, Inc. ("American").  Plaintiffs allege violation of the Railway Labor Act, 45 U.S.C.

§ 151 et seq., against TWU and Local 501 for breach of their duty of fair representation, and

against American for breach of the Collective Bargaining Agreement ("CBA").  The parties filed

cross-motions for summary judgment.  For the reasons stated below, plaintiffs' motion for

summary judgment is denied and defendants' motion for summary judgment is granted.

# I.    Background.

## A.    The Parties.

Plaintiffs are former employees of American who worked at either John F. Kennedy International Airport ("JFK") or LaGuardia Airport ("LaGuardia") between 1995 and 2002.  In 1995, plaintiffs were all classified as Title II Utility Men.  Title II refers to the Collective Bargaining Agreement ("CBA") which covered plaintiffs.[1]  Utility Men refers to plaintiffs' job function, which included cleaning buildings.

The Title II CBA was one of several CBAs that covered American employees, with each CBA covering a different subset of employees based on their Title Group.  Another CBA (and the only other CBA relevant to this matter) was the Title III CBA, which covered American employees who were classified as Fleet Service Clerks or Junior Fleet Service Clerks.  (R.7 at 22 (1995 Title III CBA); R.10 at 37 (2001 Title III CBA).)  The Title III CBA was identical in all material respects to the Title II CBA.  However, whether an employee was classified as a Title II employee or a Title III employee had significant implications relating to seniority.  Seniority was determined by the employee's Occupational Group Title, and seniority accrued from the date of first assignment within the particular Title Group, regardless of the particular classification within that Group.  (R.8 at 548 (1995 Title II CBA); R.9 at 44 (2001 Title II CBA).)

Defendant TWU serves as the collective bargaining representative of employees of American at numerous airports and in several classifications.  Defendant Local 501 is TWU's

---

[1] The 1995 Title II CBA covered American Airlines employees who were classified as, inter alia, Plant Maintenance Man, Cabin Cleaner and Cleaner – Building (also known as Building Cleaner).  (R.8 at 549.)  The 2001 Title II CBA included the same classifications as the 1995 CBA, but also listed "Utility Man" as a classification covered by the agreement.  (R.9 at AA0453.)

local union representative at six airports (including JFK and LaGuardia) for three Title Groups (including Title II and Title III).

B.     <u>Elimination of Plaintiffs' Classification.</u>

During the negotiations for the Title II CBA that was finalized in August of 1995, American and TWU agreed to contract out the work of cleaning buildings. (R.8 at 667 (8/15/95 Letter Agreement).) Up to that point the work had been performed by Utility Men, so American and TWU also agreed to eliminate the Utility Man position. (<u>Id.</u>) The agreement included protections for the Utility Men. The 1995 Letter Agreement memorializing the plan ("1995 LOA") stated that the Utility Men would be moved to either the Title II Plant Maintenance Man classification or the Title III Fleet Service Clerk ("FSC") classification, and that they would be "protected" in whichever classification they were moved to. (<u>Id.</u>) A subsequent letter from Mark Burdette, the Managing Director of Employment Relations at American, noted that former Utility Men would be "protected in the <u>first</u> classification in which they go." (R.18 (emphasis added).) The 1995 LOA also stated that "no employee [would] be forced to relocate to another station." (R.8 at 667.) Burdette later clarified this provision, stating that the commitment not to force Building Cleaners to relocate "does not extend to relocation as a result of displacement by a more senior employee, nor to schedule related reductions which may be required." (R.9 at AA0580 (1/19/96 Letter).) For various reasons discussed below, the plans to move plaintiffs into both the Plant Maintenance Man classification and the FSC classification proved to be problematic.

The plan to move Utility Men into the Plant Maintenance Man classification was problematic for a simple reason – it was not possible to accommodate most of the Utility Men in the Plant Maintenance Man classification. The Plant Maintenance Man classification involved,

inter alia, "work of a semi-skilled to skilled nature as a helper or assistant to an Automotive Mechanic or Facility Maintenance Mechanic," and "assist[ing] in storage, removal, and clean-up of hazardous waste." (R.8 at 608). This work required additional training that many of the Utility Men (including plaintiffs) did not have. Plaintiffs are all former Utility Men who admittedly did not qualify to be placed in the Title II Plant Maintenance Man classification.

The plan to move Utility Men to the FSC classification faced a different problem caused by the duel-track seniority system at American: it would have required transitioning Title II workers to a Title III classification. As stated above, employee seniority was determined from the date of first assignment within a particular Title Group. Because Utility Men had accumulated seniority as Title II employees, a transition to the Title III FSC classification would have caused them to lose all of the seniority that they had accumulated as employees of American Airlines.[2] Recognizing the seniority problem, American and TWU agreed that no former Utility Men would be forced to transfer into the FSC classification. (R.14; R.18.)

Not surprisingly, the seniority problem did not go away. Issues concerning seniority are frequently the most important issues that arise in CBA negotiations. Franks v. Bowman Transportation Co., 424 U.S. 747, 766 (1976) ("More than any other provision of the collective-bargaining agreement seniority affects the economic security of the individual employee covered by its terms."); In re Royal Composing Room, Inc., 848 F.2d 345, 356 (2d Cir. 1988) (Feinberg, C.J., dissenting) ("[Seniority] has become one of the cornerstones of American unionism. Seniority is the most important, and often the only, equity workers have in their company. It is

---

[2] The August 15, 1995 letter agreement under which former Utility Men were authorized to move to the Fleet Service Clerk classification did not address the issue of seniority. American proposed moving the former Utility Men to the Title III Fleet Service Clerk while letting them convert their Title II seniority into Title III seniority, but TWU found that solution unacceptable because of the backlash it would receive from Title III incumbents. (R.24 at 5; see also R.14.)

one of the chief protections a worker has from management's vagaries, and it preserves the self-esteem and financial security of workers who have devoted their lives to building a company."). The failure of American and TWU to fix the seniority problem doomed the agreement from its inception.

At oral argument, counsel for TWU attempted to explain how the parties, who were all sophisticated actors with experience in labor negotiations, could have ever thought that this agreement would be a viable solution. He stated:

> In the summer of 1995, the TWU and American Airlines were not just simply focusing on what are we going to do with the building cleaners at JFK and LaGuardia and can American outsource that work to non-employees and what are we going to do with the people who used to clean the buildings.
>
> They are dealing with an entire contract, dealing with lots of employees in different classifications, in different titles . . . .
>
> I think as a practical matter the answer to your question is, the parties have so much on their plate, they were trying to reach so many big issues, that on this one they said well, we think this would work as the solution. They threw it down as the August 15th letter of agreement and then quickly realized after they went home, took a shower and had a night's sleep, that it wasn't going to work as cleanly as they cobbled together at the negotiating table and then embarked on the process that eventually led us here.

(7/14/11 Tr. at 11.) Plaintiffs do not contest this description of the events that led to the 1995 LOA. In short, both sides agree that the parties reached an agreement in 1995 that was doomed to fail because it did not resolve the key issue of seniority.

When American and TWU recognized that the plan to move former Utility Men to Title III Fleet Service was unworkable, they devised an alternative plan; they agreed to move the former Utility Men into the recently-created Title II classification of "Cabin Cleaner."[3] The

---

[3] The Cabin Cleaner title had been created as part of the 1995 Title II CBA.

1995 Title II CBA described the scope of work for the Cabin Cleaner classification as "those functions required for the provisioning and cleaning associated with dedicated overnight (e.g. - Level 1 and fleet work) and International cabin cleaning (e.g.- BXT bill of work)."[4]  (R.8 at 609.) Thus, by definition, Cabin Cleaner work overlapped considerably with Fleet Service work.

C.      1996 Arbitration Award.

Although the plan to move the former Utility Men to the Cabin Cleaner classification was intended to avoid the problems discussed above, it was not without its own problems.  The first issue that arose following the reassignment dealt with the pay scale for former Utility Workers who were now classified as Cabin Cleaners.  Because the base pay for Utility Men exceeded the top rate of pay for Cabin Cleaners, American took the position that the former Utility Workers were entitled to maintain their current hourly pay rate, but that they were not entitled to continue at their old pay progression.  The Union responded by arguing that, because American had assured the Union that every employee would be protected in status and classification during the CBA negotiations, the Utility Men who were subsequently transferred to the Cabin Cleaner classification were entitled to continue on their former pay scale.

The parties submitted the compensation dispute to the General Board of Adjustment ("Board").[5]  The Board summarized the issue before it as "whether the Company has failed to pay the former Utility Man pay progression rates to former Utility Men who were transferred to the Cabin Cleaner classification, and if so what the remedy shall be."  (R.22 at 1.)  On October

_____

[4] Fleet work referred to the work of Fleet Service Clerks/Junior Fleet Service Clerk described in the 1995 Title III CBA at Appendix B.

[5] The General Board of Adjustments was established pursuant to section 204 of the RLA to handle "disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions."  45 U.S.C. § 184; Baylis v. Marriott Corp., 843 F.2d 658, 662-63 (2d Cir. 1988).

16, 1996, the Board issued an Award stating that the former Utility Men who had been reassigned to Cabin Cleaning would be assigned back to the Utility Man classification, and that they would be cross-utilized to any other classification where qualified.  However, the Award stated that "where there is a recall list for a classification, cross-utilization of Utility Men will not be used to avoid a recall."  (R.25 at 11.)  None of the affected parties – namely, the Company, the Union or the affected employee – sought clarification from the Board, as they were entitled to do under the 1995 Title II CBA (R.8 at 575), or sought judicial review of the Award pursuant to section 3 of the RLA, 45 U.S.C. § 153.  According to the CBA, other than the rights or privileges afforded the parties by the RLA, a decision made by a majority vote of a Board is "final and binding upon the parties to [the] dispute."  (R.8 at 575.)

Shortly after the Board issued its decision, American circulated a letter to its various station managers informing them that the Award required American to "[r]eturn[] all former Utility Men who are currently Cabin Cleaners to the Utility Man classification," and allowed Utility Men to be "cross utilized daily into either Cabin or Fleet Service."  (R.26.)  The letter stated that "[n]othing in the award modifies the original contractual agreement between the parties eliminating the Utility Man classification.  The classification of these employees to Utility Man does not reinstate the former Utility Man work as being included in the scope of the Maintenance agreement, nor does it necessitate the resumption of former Utility Man work which has been contracted out."  (Id.)  It also addressed some of the logistics of allowing Utility Men to be cross-utilized to perform FSC or Cabin Cleaning work.  The letter stated:  "Utility Men will have their own shift bid," and "Management may determine the appropriate allocation of Utility Men shifts as it does for any other classification."  (Id.)  Finally, the letter stated that "Utility Men may be cross utilized to a shift where a preponderance of their work is Cabin

Cleaning, but will not be subject to the work restrictions of the Cabin Cleaning classification, i.e., they may do work such as Lav and water servicing, and exterior cockpit window cleaning which are not part of the Cabin Cleaning classification." (Id.)

In 2001, the Utility Man position was added back into the Title II CBA. (R.9 at AA0453, AA0464.)

D.    Implementation of the 1996 Board Award.

In order to implement the 1996 Award, American assigned most of the Utility Men to the night shift cleaning aircraft cabins. (Chiofalo Dep. at 55; Gil Dep. at 36.) As a result, the Fleet Service Clerks who formerly worked that shift were required to bid other shifts, which the Fleet Service Clerks viewed as a violation of the 1996 Award.

On December 4, 1997, American and the TWU entered into a Letter of Understanding stating that the Company would cease hiring new employees into the (Title II) Cabin Cleaner classification. (R.29.) The parties agreed that, as Cabin Cleaner positions became available through attrition, their work would be assumed by (Title III) Fleet Service Clerks. (Id.) The purpose of the December 4, 1997 Letter of Understanding was to begin a process of transitioning all work performed by Cabin Cleaners back to Fleet Service Clerks. (Id.; Weel Dep. at 114-15.)

E.    1998 Arbitration Award.

In 1998, the Fleet Service Clerks filed a grievance with the Board arguing that cross utilization of Utility Men violated the 1996 Award or the 1997 Letter of Understanding. On June 17, 1998, the Board issued an Award denying the Fleet Service Clerks' grievance. The Award specifically held that regular use of Utility Men to perform Fleet Service or Cabin Cleaning work constitutes cross utilization, even though it differs from "the typical cross-utilization under the

provisions of the agreement." (R.31.) It then held that such cross utilization of Utility Men did not violate either the 1996 Award or the 1997 Letter of Understanding. (Id.)

F.     2002 Elections for the Local 501 Executive Board.

In late 2001 and 2002, as a result of a severe downturn in the airline industry following September 11, 2001, American was forced to furlough a significant number of workers, including approximately six hundred Fleet Service Clerks. (R.76.) Not surprisingly, this furloughing of Title III Fleet Service Clerks, in conjunction with the continued cross-utilization of Title II Utility Men in the Fleet Service Clerk and Cabin Cleaning classifications, became an important issue in the 2002 election for the Executive Board of Local 501 ("Executive Board").

One of the objectives of the slate of candidates that included Michael Chiofalo for President and Albert Gil for Treasurer of Local 501 was the elimination of the Title II former Utility Men from cabin service. During the 2002 campaign, the Chiofalo/Gil slate of candidates ran in part on the platform that Title II workers should not be in cabin service. (Gil Dep. at 70.) Once the Chiofalo/Gil slate was elected to the Executive Board, that position became the official position of the Executive Board, which was made up entirely of Title III employees.[6] (Id. at 69; Chiofalo Dep. at 146-47 (As president, it was Chiofalo's position that "all of the work Title II people were doing in Cabin Service was Title III work.").)

The position of the Executive Board was not simply that it was improper to cross utilize Utility Men for Fleet work while Fleet Service Clerks were on layoff. At least some members of the Executive Board, including Chiofalo and Gil, believed that Title II employees should not have been cleaning cabins, regardless of whether they were classified as Utility Men or Cabin Cleaners. (Chiofalo Dep. at 454-55 ("[E]ven though there was a provision in the collective

_____

[6] Some Title II employees ran for office but were not elected. (Gil Dep. at 69.)

bargaining agreement [providing that there is a classification of Cabin Cleaner], the Local's position remained that notwithstanding that provision, the Cabin Cleaner work was Title III work."); Id. at 164-65 ("Between March of 1996 and December of 2002, that work belonged to Title III, and that if Title II personnel were performing it, they were performing it on the basis of being cross-utilized."); Gil Dep. 68-69, 71-72.)  In their view, cabin service work belonged to Title III workers because it had "always [been] Title III before 1995.  Going back to the 1940s." (Gil Dep. at 36-37.)

In addition, Chiofalo's resentment of Title II workers pre-dated 9/11 and the furloughing of Fleet Service Clerks.  Kenneth Donahue, American's Customer Service Manager at LaGuardia, testified at his deposition about numerous conversations he had had with Chiofalo prior to 9/11 in which Chiofalo had said that he couldn't stand the Title II workers and that they were "nothing but an f-in headache."  (Donahue Dep. at 106-10.)  According to Donahue, Chiofalo believed that Title II workers should have been gone when they did away with their job as building cleaners, and that he had stated that he would "do [his] best to get these people out of here."  (Id. at 74-75, 106-07.)  And when Local 501 reached an agreement with American to eliminate Title II workers from cabin service, Chiofalo told Donahue, "I finally did it.  I got rid of them."  (Donahue Dep. at 108-10.)

G.      2002 Presidential Grievance and Settlement Agreement.

On September 24, 2002, the President of Local 501 filed a grievance on behalf of the Local Union[7] ("Presidential Grievance") alleging that American was violating the 1996 System Board Award by cross-utilizing Utility Men to perform Fleet Service Clerks' cabin cleaning

---

[7] The Presidents of the Local Unions are recognized as an "Accredited International Representative of the Union" for purposes of Article 29(d) of the 2001 Title II CBA and had the authority to file grievances in behalf of the Local Union.

work while there were Fleet Service Clerks on layoff. (R.37.) Specifically, the Presidential

Grievance cited the Award's holding that "[w]here there is a recall list for a classification, cross-

utilization of Utility Men will not be used to avoid a recall." (R.37; R.22 at 11.)

In November 2002, the parties agreed to settle the Presidential Grievance.[8] In the

November 11, 2002 settlement agreement between American and Local 501, American agreed to

discontinue the cross-utilization of the Utility Men to perform cabin cleaning work at JFK and

LaGuardia airports. (R.41.) American agreed to create an equivalent number of Title III Fleet

Service Clerk positions to perform the cabin cleaning work that the Utility Men were

performing. Although the agreement stated that the elimination of Utility Men in cabin

maintenance was necessitated by a "reduction in force"[9] ("RIF"), (id.), representatives for both

American and TWU conceded that it was not a RIF in the true sense because it was not

immediately preceded by a curtailment of work. (Morton Dep. at 129-30; Conley Dep. at 105-

06.)

Shortly before and after American and Local 501 settled the Presidential Grievance,

plaintiff Donna Bates sent various communications to TWU seeking the International's

intervention. (Bates Dep. 12, 22; R.5; R.39; R.43.) In response to Bates' communications, three

representative of TWU – John Conley, James Little and Gary Yingst – investigated the

---

[8] The parties dispute why American agreed to settle the grievance. According to American, it believed that it faced significant potential liability under the 1996 System Board Award if it continued to cross-utilize the Utility Men to perform cabin cleaning work while there were Fleet Service Clerks on furlough. (Weel Dep. at 148-150.) According to plaintiffs, American colluded with Local 501 to breach plaintiffs' contractual rights. (Pls.' Opp. to American's Mot. for Summary Judgment at 16; Plaintiffs' Local Rule 56.1(b) Statement to the Defendant AA's Motion at ¶¶ 54-65.)

[9] Reduction in Force is not explicitly defined in the CBA, (Ex. 9 § 2 (Definitions)), however the CBA states: "All . . . reductions in force of full time and part time employees for lack of work will be handled separately in accordance with seniority," and that an employee who is "directly affected by a curtailment of work requiring a reduction in force may" exercise his seniority as outlined in the CBA. (Id. at AA0504.)

Presidential Grievance and determined that the settlement was consistent with plaintiffs' rights under the CBA, as well as the 1996 and 1998 Board Awards.[10]

On the same day that American and Local 501 agreed to settle the Presidential Grievance, American entered into a separate agreement with Local 501 that eliminated the JFK bus drivers and their routes. (R.40.) Unlike the agreement concerning the Utility Men, the agreement concerning the bus drivers did not involve a RIF despite the curtailment of work that resulted from the elimination of all bus service at JFK. Instead, the bus drivers, who were classified as Title III Service Clerks, went back to being clerks. (Morton Dep. at 118-19.)

Two weeks later, American sent plaintiffs a notice informing them that they would be affected by a RIF, and that December 13, 2002 would be their last day as Utility Men at JFK or LaGuardia. The notice instructed plaintiffs that they had until December 2, 2002 to exercise their seniority if they chose to do so. They were also given the option of accepting a full time Utility Man position at the Tulsa, Oklahoma maintenance base ("TULE"). All but one of the plaintiffs chose to exercise their seniority to displace a Title III Fleet Service Clerk at JFK or LaGuardia.[11] Because Article 15(b) of the Title II Agreement provides that employees who are affected by a reduction-in-force may displace another employee only within their Title group, (R.9 at AA0504), American denied plaintiffs' requests to displace Title III employees.

H.    Plaintiffs' Grievance.

On December 19, 2002, the plaintiffs formerly employed at LaGuardia filed a grievance against American, and on December 20, 2002, the plaintiffs formerly employed at JFK filed a similar grievance. (R.54; R.55.) In their grievances, plaintiffs stated that, pursuant to the 1996

---

[10] The parties dispute what specific steps that Conley, Little and Yingst took to investigate whether the settlement was consistent with the CBA and the two Board Awards.

[11] One of the Plaintiffs, Renford Scott, elected the option to displace a Cabin Cleaner with less Title II seniority at JFK. (Scott Dep. 56-59; R.11.)

System Board Award, they were cross-utilized "exclusively" to perform (Title III) Fleet Service

Clerk work "for which they received no seniority at all."  Plaintiffs claimed that they were, in

effect, denied "any protective occupational or classification seniority" because the Title II

seniority they accrued was "exclusively [in] a classification that no longer exists, Utility Man."

According to plaintiffs' grievance, the Fleet Service Clerks with "less seniority" should have

been laid off instead of the plaintiffs.  (R.54; R.55.)  On December 23, 2002, American denied

plaintiffs' grievance.  (R.55.)  Local 501 did not pursue the grievance to arbitration.

I.      Procedural History.

Plaintiffs filed this action on May 8, 2003 – less than six months after (1) American and

Local 501 agreed to discontinue the cross-utilization of the Utility Men to perform cabin

cleaning work at JFK and LaGuardia airports, and (2) American denied plaintiffs' grievance

regarding their seniority, but almost eight years after the Letter of Understanding eliminating the

Utility Man position, and almost seven years after the Board reinstated the Utility Man

classification and ordered that plaintiffs be reassigned to that classification and cross-utilized to

perform Fleet Service work.

In November of 2003, defendants moved to dismiss plaintiffs' complaint.  In a 2004

Memorandum and Opinion, Musto v. Transport Workers Union of Am., 339 F. Supp. 2d 456

(E.D.N.Y. 2004), the Honorable David G. Trager denied plaintiffs' request.  Judge Trager held

that plaintiffs' claims would not be barred by the six-month statute of limitations for hybrid

claims under the RLA if plaintiffs had not been put on notice as to what their seniority status

was.[12]  Judge Trager then addressed the merits of plaintiffs' complaint and held that plaintiffs

_____

[12] Judge Trager also held that, even if plaintiffs' seniority claims were time-barred,
plaintiffs' non-seniority claims regarding the TULE relocation option would not be time-barred
because those claims "have no relation to the seniority question."  Musto, 399 F. Supp. 2d at 464.

had adequately alleged facts showing that the union breached the duty of fair representation by (1) failing to pursue plaintiffs' grievances in bad faith and for discriminatory reasons, and (2) failing to represent plaintiffs' interest during the November 2002 contract negotiations with American that led to the elimination of their jobs. Id. at 466-68. With regard to American, Judge Trager found that plaintiffs had stated a colorable claim that American breached the CBA by (1) retaining Fleet Service Clerks with fewer years performing Fleet Service Work than plaintiffs, (2) hiring new personnel for the FSC position while laying off plaintiffs, and (3) requiring plaintiffs to relocate to a station that did not have vacancies in their classification, all in violation of their rights under the CBA relating to layoffs, transfers and seniority.[13] Id. at 472-73.

Since Judge Trager denied defendants' motion to dismiss, the parties have conducted extensive discovery. All parties now move for summary judgment. For the reasons stated below, plaintiffs' motion for summary judgment is denied and defendants' motions for summary judgment are granted.

## II.    Discussion.

### A.    Legal Standard.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The district court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

---

[13] Judge Trager also held that plaintiffs' claims would not be within the exclusive jurisdiction of the grievance and arbitration procedures of the CBA and RLA so long as plaintiffs can show that the union's alleged breach of its duty of fair representation "is 'inextricably linked' to the employer's alleged breach of the CBA." (Id. at 25-26.)

(1986).  The court must then determine whether "a jury might return a verdict in his favor."  Id.

at 257.  "Only when no reasonable trier of fact could find in favor of the nonmoving party should

summary judgment be granted."  Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

B.      Hybrid Claims Under the RLA.

Under the RLA, a plaintiff can assert a "hybrid" claim against both his union for

breaching its duty of fair representation and his employer for breaching its duties under the

collective-bargaining agreement.  West v. Conrail, 481 U.S. 35, 36 (1987).  "To establish a

hybrid . . . claim, a plaintiff must prove both (1) that the employer breached a collective

bargaining agreement, and (2) that the union breached its duty of fair representation vis-a-vis the

union members."  White v. White Food, 237 F.3d 174, 178 (2d Cir. 2001) (discussing a hybrid

claim under the Labor Management Relations Act, 29 U.S.C. § 185).  Failure to prove a breach

of either duty dooms plaintiff's claims against both the employer and the union.

C.      Statute of Limitations.

Plaintiffs' claims are governed by a six month statute of limitations.  Musto, 339 F. Supp.

2d at 460.  "[T]he cause of action accrues no later than the time when plaintiffs knew or

reasonably should have known that such a breach [of the duty of fair representation] had

occurred."  Id.

In the 2006 Memorandum and Order denying defendants' motion to dismiss, Judge

Trager found that there was a question of fact as to whether plaintiffs were on actual notice of

what their seniority was.  Id. at 461-62.  Although the record has been further developed since

Judge Trager denied defendants' motion to dismiss, the question persists as to whether plaintiffs

were aware that their seniority did not afford them any protection with regard to the cabin

cleaning work that they were performing.

Defendants argue that plaintiffs were aware that they were not protected in the Cabin Cleaning/FSC classifications. In support of this argument, they point to evidence that some plaintiffs sought Title III seniority after the Board issued the 1996 Award. (Headley Dep. 111-12; Bates Dep. 107-08; Edwards Dep. 125; Sullivan Dep. 70, 86-87, 89-92, 94.) In addition, some plaintiffs requested dual seniority (Bates Dep. 90, 107-09; Bates Dep. II 45-46), and some considered filing a grievance in 1998 because they were not receiving Title III seniority, but eventually decided not to because they did not want to "make any waves." (Bates Dep. II 102-04, 108; Musto Dep. 96-97.)

Although this evidence suggests that plaintiffs may have recognized benefits to obtaining Title III seniority, it does not prove that plaintiffs were aware that they were not protected in the Cabin Cleaning/FSC classifications. There were numerous other reasons that plaintiffs may have sought Title III seniority. Title III employees were able to bid on better shifts than Title II employees. At first, Title II employees could only bid on overnight shifts. Eventually, American allowed them to bid on a certain number of afternoon shifts, but only shifts that were set aside for Title II employees. (Chiofalo Dep. 55; Gil Dep. 35-36, 160-62; Dallas Dep. 82-83.) Title III Fleet Service Clerks were also paid more than their Title II counterparts. (Musto Dep. at 92.)

In addition, there were benefits to maintaining Title II seniority that plaintiffs would not have been entitled to if they had become Title III employees. As early as 1998-99, plaintiffs were able to bid Fleet Service jobs and even take Crew Chief positions from Title III employees. (R.12; Gil Dep. 44-49.) And Title II employees had certain priority in choosing vacations, days off and holidays. (Sullivan Dep. at 33-34.)

Because there is a question of fact with regard to whether plaintiffs were aware that their seniority did not afford them any protection with regard to cabin cleaning work, summary judgment is not appropriate.

D.  Jurisdiction.

Section 204 of the RLA provides for the creation of the General Board of Adjustments, which has jurisdiction to handle "disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions."  45 U.S.C. § 184; Baylis v. Marriott Corp., 843 F.2d 658, 662-63 (2d Cir. 1988).  That section states:

> The disputes between an employee or group of employees and a carrier . . . by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . shall be handled in the usual manner . . .; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board . . . with a full statement of the facts and supporting data bearing on the disputes.

45 U.S.C. § 184.  The Supreme Court has held that the exhaustion of these procedures is generally required under the Act.  Andrews v. Louisville & N.R.R., 406 U.S. 320, 322 (1972).

Defendants argue that the court does not have jurisdiction to consider the arguments presented in plaintiffs' motion papers because those arguments were never presented to the Union or American through the grievance and arbitration procedures mandated by the RLA. Although plaintiffs filed a grievance with the Board of Adjustments, they argued in their grievance that they were improperly denied Title III seniority because they had been performing Title III FSC work on a cross-utilized basis.  In plaintiffs' motion papers, they change course and argue that they were not cross utilized, but rather were "rightfully performing Title II work in cabin service."  Pls.' Mem. at 8 (emphasis in original).

Given that section 204 of the RLA simply requires "a full statement of the facts and supporting data bearing on the disputes" in support of any grievance, it seems reasonable to believe that plaintiffs exhausted the grievance procedures by filing a grievance that stated the relevant facts of the claim: that they had been performing cabin cleaning work since 1996 pursuant to the 1996 Board Award; that American was forcing them to either relocate to TULE or go on layoff; and that Fleet Service Clerks with less seniority were performing the same work that they had been performing. However, because plaintiffs' suit fails on the merits, it is unnecessary to decide whether plaintiffs failed to exhaust the dispute resolution procedures required by the RLA.

        E.      <u>Duty of Fair Representation.</u>

A union has a duty to fairly represent all employees subject to the collective bargaining agreement. <u>Air Line Pilots Ass'n v. O'Neill</u>, 499 U.S. 65 (1991); <u>Tunstall v. Brotherhood of Locomotive Firemen</u>, 323 U.S. 210 (1944); <u>Steele v. Louisvill & N.R. Co.</u>, 323 U.S. 192 (1944). This duty extends to both the negotiation of a collective bargaining agreement and its enforcement and administration. <u>O'Neill</u>, 499 U.S. at 77. A union breaches its duty of fair representation if its actions "can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith." <u>Spellacy v. Airline Pilots Ass'n-Int'l</u>, 156 F.3d 120, 126 (2d Cir. 1998) (quoting <u>O'Neill</u>, 499 U.S. at 74). "Judicial review of union action, however, must be highly deferential, recognizing the wide latitude that unions need for the effective performance of their bargaining responsibilities." <u>Id.</u>

A union's conduct can be classified as arbitrary only "when it is without a rational basis or explanation." <u>Marquez</u>, 525 U.S. at 46; <u>O'Neill</u>, 499 U.S. at 67. Unions are given a "wide range of reasonableness" within which they may lawfully act. <u>Marquez</u>, 525 U.S. at 46; <u>O'Neill</u>,

499 U.S. at 67.  This range "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong."  Marquez, 525 U.S. at 45-46. See also USWA v. Rawson, 495 U.S. 362, 372-73 (1990) ("The courts have in general assumed that mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation, and we endorse that view today"); Amalgamated Ass'n of Motor Coach Employees v. Lockridge, 403 U.S. 274, 301 (1971) (distinguishing between deliberate, hostile conduct, which breaches duty of fair representation, and honest, mistaken conduct, which does not).

In the context of interpreting provisions of a CBA, a court may find that a union's interpretation of the provision was reasonable as a matter of law, even if the court disagrees with the interpretation reached by the union, so long as the unions actions were not "'so far outside a wide range of reasonableness' as to constitute irrational or arbitrary conduct."  Chaparro-Febus v. Int'l Longshoremen Assoc., Local 1575, 983 F.2d 325, (1st Cir. 1992 (as amended 1993))(quoting O'Neill, 499 U.S. at 78).  Furthermore, a union's conduct is to be evaluated "in light of the factual and legal landscape at the time of the union's actions."  O'Neill, 499 U.S. at 67; Spellacy v. ALPA, 156 F.3d 120, 129 (2d Cir. 1998).  A union cannot be faulted for failing to consider an option that the plaintiffs never presented.  See Haerum v. ALPA, 892 F.2d 216, 222 n.2 (2d Cir. 1989) (affirming summary judgment to union on DFR seniority claim).

A union acts in a discriminatory manner when it takes actions favoring some of its members at the expense of others without a legitimate purpose.  Laborers and Hod Carriers Local No. 341 v. NLRB, 564 F.2d 834, 840 (9th Cir. 1977); Barton Brands Ltd. v. NLRB, 529 F.2d 793, 799-800 (7th Cir. 1976).  This is not to say that a union is prohibited from acting in a manner that favors one group of constituents over another.  But a union may not act in a way that

favors a group of constituents over others for arbitrary or invidious reasons. <u>Jones v. Trans World Airlines, Inc.</u>, 495 F.2d 790, 797 (2d Cir. 1974). For example, a union may not discriminate against one group based entirely on union membership or political power within the union. <u>See</u> <u>Ferro v. Railway Express Agency</u>, 296 F.2d 847, 851 (2d Cir. 1961) ("A bargain which favors one class of employees over another is not necessarily prohibited as a hostile discrimination. However, it is not proper for a bargaining agent in representing all of the employees to draw distinctions among them which are based upon their political power within the union." (citations omitted)); <u>Bernard v. Air Line Pilots Ass'n, Int'l</u>, 873 F.2d 213, 216 (9th Cir. 1989) (holding that a union may not discriminate on the basis of union membership); <u>Barton Brands Ltd. v. NLRB</u>, 529 F.2d 793, 798-99 (7th Cir. 1976) ("While a union may make seniority decisions within a wide range of reasonableness in serving the interests of the unit it represents, such decisions may not be made solely for the benefit of a stronger, more politically favored group over a minority group." (citation and internal quotation marks omitted)); <u>Ramey v. District 141 Int'l Assoc. of Machinists and Aerospace Workers</u>, 99-cv-4341, 2002 WL 32152292, at *10 (E.D.N.Y. Nov. 4, 2002) ("[A] union may not neglect the interests of a membership minority solely to advantage the membership majority."). <u>But see</u> <u>Schwartz v. Brotherhood of Maintenance of Way Employees</u>, 264 F.3d 1181, 1186 (10th Cir. 2001) (holding that the discriminatory prong of the duty of fair representation is limited to protected "immutable classifications such as race or other constitutionally protected categories").

Finally, a union acts in bad faith when it engages in fraud, dishonesty or other intentionally misleading conduct with an improper intent, purpose or motive. <u>Spellacy</u>, 156 F.3d at 126.

Here, plaintiffs argue that Local 501 breached its duty of fair representation by entering into the 2002 Settlement Agreement with American and by failing to pursue plaintiffs' grievance for the following reasons: (1) their conduct was based on an arbitrary and incorrect interpretation of the CBA; (2) they acted in bad faith by implementing a "specious and fictional" reduction in force to eliminate plaintiffs from cabin service at JFK and LaGuardia; and (3) they reached an agreement that was detrimental to plaintiffs because they harbored animosity towards Title II employees. Plaintiffs also argue that TWU breached its duty of fair representation by declining to intervene in the settlement of the Presidential Grievance, claiming that it was a local matter outside the TWU's jurisdiction.

1.      Local 501 Did Not Act Arbitrarily.

Plaintiffs argue that Local 501 acted arbitrarily by treating plaintiffs as Title II Utility Men being cross-utilized to perform Title III FSC work despite the fact that the Utility Man position had be eliminated from the 1995 Title II CBA, and the fact that Local 501 and American had previously agreed to move plaintiffs into the Cabin Cleaner classification. Plaintiffs further argue that, because Local 501 treated plaintiffs as Title II Utility Men instead of Title II Cabin Cleaners, they acted arbitrarily and in clear violation of Article 15 of the 2001 Title II CBA when they instituted a "so-called reduction in force" even though there was no curtailment of work or lack of work.

No reasonable jury could conclude that Local 501 acted without a rational basis because it treated plaintiffs as Title II Utility Men for seniority purposes. The 1996 Award clearly states that former Utility Men who had been assigned to the Cabin Cleaner classification were to be "reassigned to the Utility Man classification," and that they would be "cross-utilized . . . to any other classification, where qualified." (R.25 at 11.) Plaintiffs did not seek clarification of the

1996 Award from the Board or judicial review pursuant to section 3 of the RLA.  Therefore, Local 501 acted reasonably in complying with the determination of the Board.

Because Local 501 did not act arbitrarily by treating plaintiffs as Title II Utility Men instead of Title II Cabin Cleaners, it also did not act arbitrarily by transitioning the work of cleaning cabins that was not currently being performed by Title II Cabin Cleaners to the FSC classification.  The 1997 LOU between American and TWU stated that the work of cleaning cabins would be assumed by Title III Fleet Service Clerks as Title II Cabin Cleaners left the company.  Having found that Local 501 had a rational basis for believing that plaintiffs were Title II Utility Men, it follows that it had a rational basis for believing that the work they were performing was not being performed by Cabin Cleaners, and therefore constituted Fleet Service work pursuant to the 1997 LOU.  And because Local 501 had a rational basis for believing that plaintiffs were being cross-utilized to perform Fleet Service work while Title III Fleet Service Clerks were on layoff, it was rational for it to conclude that the arrangement violated the 1996 Award, which states:  "Where there is a recall list for a classification, cross-utilization of Utility Men will not be used to avoid a recall."

Local 501's conclusion that plaintiffs were being cross-utilized to perform Title III Fleet Service work was bolstered by the factual landscape at the time.  In plaintiffs' grievance, which they filed in response to the 2002 RIF notification, plaintiffs stated that they were "cross utilized exclusively in Title III FSC work."  (R.54, R.55.)  Plaintiffs maintained that this was their position in their amended complaint, where they stated:  "Since August 15, 1995, the Plaintiffs were exclusively cross-utilized by the Defendant American Airlines in the Fleet Service Clerk classification."  (Am. Compl. ¶ 35.)  It was not until plaintiffs filed their motion for summary judgment in April 2010 that they took the position that they had never been cross-utilized (Pls.'

56.1 Statement in Supp. of Their Mot. to Dismiss ¶¶ 64, 73 & n.14, 81), and that they had been performing the work of their Title II Cabin Cleaner classification since March 25, 1996 (id. ¶ 76-80).  Because Local 501's position was consistent with the position taken by plaintiffs at the time, the factual landscape provides an additional rational basis for Local 501's position.

Local 501 also did not act arbitrarily by referring to the plan to replace cross-utilized Utility Men with Fleet Service Clerks as a RIF.  American and Local 501 agreed to institute a RIF because Title III Fleet Service Clerks were on layoff due to a curtailment of work following 9/11.  Although the curtailment of work did not directly precede the decision to institute an RIF, Local 501 had a rational basis for believing that the decision to replace Utility Men with Fleet Service Clerks was a direct effect of the curtailment of work caused by 9/11.  The Union's position was that the Utility Men should have been the first to go following the curtailment of work caused by 9/11.  The fact that the President of Local 501 had to bring a grievance to remedy what he considered to be a clear violation of the 1996 Award does not change the fact that the Union viewed the RIF as being directly caused by the curtailment of work following 9/11.  Even if I were to find that the Union incorrectly interpreted Article 15 of the 2001 Title II CBA regarding a RIF (which I do not, see supra Part II.F), it would not change the fact that no reasonable jury could find that Local 501 acted irrationally in interpreting Article 15 to allow American to institute a RIF under the circumstances.

### 2. Local 501 Did Not Act In Bad Faith.

Plaintiff argues that Local 501 acted in bad faith by implementing a "fictional" RIF so as to replace Title II employees with Title III employees person-for-person.  However, no reasonable jury could find that Local 501 made any fraudulent statements concerning the agreement to replace Title II employees with Title III employees in cabin service.

To start with, a strong argument could be made that the events that led to the layoff of Title II employees did constitute a RIF. The CBA does not explicitly define a RIF. (Ex. 9 § 2 (Definitions)). However, the CBA states: "All . . . reductions in force of full time and part time employees for lack of work will be handled separately in accordance with seniority," and that an employee who is "directly affected by a curtailment of work requiring a reduction in force may" exercise his seniority as outlined in the CBA. (Id. at AA0504.) This suggests that a RIF may only be instituted when there is a "lack of work" or a "curtailment of work."

Even if it is true that a RIF may only be implemented for a "lack of work" or "curtailment of work," the events that led up to the 2002 Agreement fit comfortably within that definition. It is undisputed that, after 9/11, there was a curtailment of FSC work at both JFK and LaGuardia. Initially, American responded to the curtailment of work by putting Fleet Service Clerks on layoff. When Local 501 objected to this response, arguing that it violated the 1996 Award, American agreed to place Title II employees on layoff and recall the Title III employees that had previously been put on layoff. Even if this decision was not immediately preceded by a curtailment of work, it was nonetheless caused by the curtailment of work that occurred after 9/11. Therefore, Local 501 appears to have been correct when it characterized the events that led to the layoff of Title II employees as a RIF.

Furthermore, even if those events did not constitute a RIF within the meaning of the CBA, plaintiffs would still be unable to prove that Local 501 acted in bad faith because there is no evidence that Local 501 engaged in any fraud, dishonesty or other intentionally misleading conduct. At most, Local 501 interpreted the provisions of the CBA that refer to a RIF incorrectly. There is no evidence that they made any misleading statements about the so-called RIF.

The letter that Chiofalo sent to the union members describing the so-called RIF stated: "After 9/11, the company's position, financially, became very grave and we entered into a RIF (reduction in force). . . .  As members of Fleet Service hit the street or were displaced to other stations, Title II continues to perform Fleet Service work."  (R.45.)  Local 501's position was that the RIF in the FSC classification constituted a breach of the 1996 Award, and that "Title II members must be given positions in their classification with their job scope."  (Id.)  Regardless of whether the events described by Local 501 constitute a RIF within the meaning of the CBA, it is clear that they accurately describe what transpired with regard to plaintiffs in 2001 and 2002.

Because Local 501 did not make any fraudulent statements concerning the agreement to replace Title II employees with Title III employees, no reasonable jury could find that Local 501 acted in bad faith by implementing a RIF to replace Title II employees with Title III employees.

3.     There Is a Disputed Question of Fact as to Whether Local 501 Acted With a Discriminatory Motive.

Plaintiffs argue that Local 501discriminated against plaintiffs when it agreed to remove Title II employees from cabin service and refused to pursue their grievance based on animosity that certain members of the Executive Board felt towards Title II employees.  (Pls.' Opp. to TWU's Mot. for Summary Judgment at 11-12, 19.)  There is a disputed question of fact whether Local 501's actions were based primarily on animosity that Chiofalo, Gal and the other members of the Executive Board held towards Title II employees, as opposed to being the result of a balanced consideration of the interests of both Title II and Title III employees.

I begin by recognizing that "[c]onflicts among members of a union are inevitable and do not prevent a union from representing all employees in the bargaining unit."  Merk v. Jewel Co., 848 F.2d 761, 764 (7th Cir. 1988).  "Unions resolve these [conflicts] in bargaining, and they are not disqualified from representing members of the bargaining unit just because some members

will benefit at the expense of others.  There may be no satisfactory way to resolve the conflicts even in principle."  Id.  So long as unions deal with conflicts by "<u>considering</u> the interests of each group (the duty of fair representation) and by conducting internal operations in a democratic fashion," courts are not to second-guess a union's decisions on how to resolve such conflicts.  Id. (emphasis original).

Being mindful of the above considerations, I find that a reasonable jury could conclude that Chiofalo harbored animosity towards Title II employees, and that his animosity towards them pre-dated 9/11.  Even before 9/11, Chiofalo had said that he couldn't stand Title II workers, that they were "nothing but an f-in headache," and that they should have been gone when American did away with their jobs.  Chiofalo (as well as the rest of the Executive Board that was elected in 2002) believed that Title II employees never belonged in cabin service.  Finally, Title II employees represented a politically weak group of employees that were unable to elect a single representative to the Local 501 Executive Board.  Based on the above, a reasonable jury could conclude that Chiofalo, Gil and the Executive Board acted in a manner that was not in the best interest of Title II employees primarily because those employees belonged to a disfavored and politically weak title group.

Although no reasonable jury could conclude that Local 501 acted in bad faith or reached an arbitrary result, a reasonable jury could find that Local 501 acted with a discriminatory animus toward Title II workers.  This alone would be enough for a reasonable jury to find that Local 501 breached its duty of fair representation.

4.      <u>TWU Did Not Act in Bad Faith.</u>

Even though a reasonable jury could conclude that Local 501 breached its duty of fair representation, no reasonable jury could conclude that TWU breached its duty of fair

representation. Plaintiffs argue that TWU breached its duty of fair representation by failing to intervene in the settlement of the Presidential Grievance. Based on the evidence in the record, no reasonable jury could conclude that TWU acted in bad faith or discriminated against plaintiffs.

The parties dispute how vigorously TWU representatives investigated plaintiffs' claims. Viewing the evidence in the light most favorable to plaintiffs, it is conceivable that a reasonable jury could conclude that TWU representatives were negligent in not investigating plaintiffs' claims more thoroughly. However, there is no evidence that TWU engaged in any fraud, dishonesty or other intentionally misleading conduct. Nor is there any evidence that any TWU representative harbored animosity towards Title II employees, or sought to discriminate against them on for an arbitrary or invidious reason.

Because the record is entirely devoid of evidence suggesting that TWU acted in bad faith or discriminated against plaintiffs, no reasonable jury could conclude that it breached its duty of fair representation.

  F.   <u>Breach of Contract.</u>

Because a reasonable jury could conclude that Local 501 (but not TWU) breached its duty of fair representation by acting with a discriminatory motive, it is next necessary to consider whether American breached the CBA.

Plaintiffs argue that American breached the CBA by (1) treating plaintiffs as Utility Men, not Cabin Cleaners, when they instituted a RIF in 2002; (2) offering them positions as Utility Men at TULE despite their job protection as Cabin Cleaners; and (3) forcing them to relocate in violation of the 1995 LOA. All three of plaintiffs' arguments turn on whether plaintiffs were classified as Utility Men or Cabin Cleaners. If they were classified as Cabin Cleaners, then the CBA would have forbidden American from replacing them worker for worker with Fleet Service

Clerks, would have required that American offer them a position at another station in the Cabin Cleaner classification, and would have protected them from a forced relocation absent a RIF in their classification. However, if they were classified as Utility Men that were being cross-utilized to perform FSC work, then American's decision to replace plaintiffs with Fleet Service Clerks and offer plaintiffs a Utility Man position at TULE would not have violated the CBA.[14]

Whether plaintiffs were classified as Utility Men or Cabin Cleaners in 2002 depends on whether the 1996 Board Award ordered that plaintiffs be returned to the Utility Man classification for all purposes or just for purposes of determining their pay scale. Plaintiffs argue that the Arbitration Award did not convert Cabin Cleaners to Utility Men because such an award would have exceeded the scope of the question presented to the Board, and therefore would have violated the scope of the Board's authority. (Pls.' Mem. of Law Supp. Mot. Summary Judgment at 15.) Defendants argue that plaintiffs have not challenged the 1996 Award, that any such challenge would be time-barred, and that, even if such a challenge were not time-barred, it would have no merit.

"The Supreme Court has characterized the scope of judicial review of a labor board's decision [under the RLA] as 'among the narrowest known to the law.'" United Transportation Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 810 (2d Cir. 2009) (quoting Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 91 (1978)). Section 3 First (q) of the RLA provides three grounds upon which a court may review a labor board's decision: (1) failure of the division to comply with the requirements of this chapter; (2) failure of the order to conform, or confine itself, to

_____

[14] Plaintiffs also argue that American breached the CBA by offering them a position at TULE because there were no vacancies at TULE, and American would have had to create vacancies to accommodate plaintiffs. However, they do not cite to any support for the proposition that American was not allowed to create vacancies in order to satisfy the job protection provisions of the CBA.

matters within the scope of the division's jurisdiction, or (3) fraud or corruption by a member of the division making the order.  45 U.S.C. § 153 First (q).  In addition, the Second Circuit has held that board decisions may be challenged in court on due process grounds.  <u>Shafii v. PLC British Airways</u>, 22 F3.d 59, 64 (2d Cir. 1994).

However, before a court may apply even the narrow judicial review authorized by the RLA, an aggrieved party must petition the court to review the award.  Section 3 First (q) of the RLA provides that an aggrieved party "may file in any United States district court in which a petition under paragraph (p) could be filed, a petition for review of the division's order."  45 U.S.C. § 153 First (q).  To date, plaintiffs have not filed a petition to vacate or modify the 1996 Award pursuant to Section 3 First (q) of the RLA.  Having elected not to pursue such a course of action, plaintiffs cannot now collaterally attack the October 1996 award in the context of this hybrid claim for breach of the duty of fair representation against the Union and for breach of contract against American.  <u>See</u> <u>Andrews v. Louisville & Nashville R.R. Co.</u>, 406 U.S. 320, 324 (1972) ("A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding.  He is limited to the judicial review of the Board's proceedings that the Act itself provides." (citation omitted)); <u>Held v. American Airlines, Inc.</u>, 06-C-4240, 2007 WL 433107, at *6 (N.D. Ill. Jan. 31, 2007) (dismissing hybrid claim that challenged a System Board arbitration award, when the plaintiff had not sought judicial review of the award pursuant to Section 3 First (q) of the RLA).

In addition, even if plaintiffs' motion for summary judgment were construed as a petition to review the 1996 Arbitration Award, such a petition would be barred by the two-year statute of limitations contained in section 3 First (r) of the RLA.  45 U.S.C. § 153 First (r); <u>Gordon v. E.</u>

Airlines, Inc., 268 F. Supp. 210, 212-13 (W.D. Va. 1967).[15]  Plaintiffs raised the issue of the

Board's authority for the first time in the supporting papers to their motion for summary

judgment, which they filed nearly fourteen years after the Board issued its Award.  The statute of

limitations for bringing such a claim has long since expired.

Plaintiffs argue that they are not challenging the 1996 Award, but merely arguing how

the Award should be interpreted.[16]  This argument is not persuasive.  The language of the 1996

Award unambiguously returns plaintiffs to the Utility Man classification.  It states that former

Utility Men who had been assigned to the Cabin Cleaner classification were to be "reassigned to

the Utility Man classification" without any indication that the reassignment was for the limited

purpose of determining their pay scale.  In addition, it states that they would be cross-utilized –

an issue that would have been irrelevant if the Board had returned plaintiffs to the Utility Man

classification only for pay purposes.

---

[15] There is an open question as to whether the statute of limitations contained in section 3 First (r) applies to awards issued by adjustment boards authorized under section 204 of the RLA, 45 U.S.C. § 184.  See Trans World Airlines, Inc. v. Independent Federation of Flight Attendants, 563 F. Supp. 1197, 1200 (S.D.N.Y. 1983).  Some courts have instead chosen to adopt the most relevant state statute of limitations, see, e.g., Hafer v. Airline Pilots Assoc., Int'l, 525 F. Supp. 874, 877 (D. Hawaii 1981) aff'd 698 F.2d 1230 (9th Cir. 1983), or the six-month statute of limitations contained in the National Labor Relations Act ("NLRA"), see, e.g., Barnett v. United Air Lines, Inc., 738 F.2d 358 (10th Cir. 1984).  However, it is unnecessary to decide whether it would be more appropriate to adopt New York's ninety day limitations periods for seeking to modify an arbitration award, N.Y. Civ. Prac. Law and Rules § 7511, New York's one year limitations period for seeking modification of an arbitration award as a defense to the action for confirmation, N.Y. Civ. Prac. Law and Rules § 7510, or the six month statute of limitations contained in section 10(b) of the NLRA, 29 U.S.C. § 160(b).  Because all of those limitations periods are shorter than the RLA's two year statute of limitations, plaintiffs' claims would be time-barred under them as well.

[16] Specifically, they argue that the Award simply cannot be interpreted to have returned plaintiffs to the Utility Man classification because such an interpretation (1) would violate the 1995 CBA (which did not include the Utility Man classification) and (2) would have exceeded the scope of the issue presented in violation of 45 U.S.C. § 158(e) ("The agreement to arbitrate. . . shall state specifically the questions to be submitted to the said board for decision; and that, in its award or awards, the said board shall confine itself strictly to decisions as to the questions so specifically submitted to it.").

If plaintiffs wished to challenge the clear language of the Award, they were required to do so in a manner consistent with the RLA, which authorizes a party to seek clarification of an award from the Board directly, 45 U.S.C. 153 First (m), or to petition this court to review the award, 45 U.S.C. 153 First (q). See Andrews, 406 U.S. at 325. Plaintiffs' characterization of their argument is irrelevant because the 1996 Award stands between them and the relief they seek. See United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 62-63 n.4 (1981).

Because plaintiffs did not challenge the 1996 Award pursuant to the RLA, they are bound by the unambiguous language of the Award, which returned plaintiffs to the Utility Man classification. And because plaintiffs cannot challenge their classification as Utility Men, no reasonable jury could conclude that American breached the CBA by treating them as Utility Men, not Cabin Cleaners. Unable to prove that American breached the CBA on their hybrid claim, plaintiffs' claim against the Union for breach of the duty of fair representation fails as well.

**III.     Conclusion**

For the reasons stated above, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted. The Clerk of the Court is instructed to enter judgment in favor of defendants and to close this case.


SO ORDERED.

Dated:  Brooklyn, New York
        August 25, 2011

                                        _____/s/_____
                                        RAYMOND J. DEARIE
                                        United States District Judge